The case number 14-6254, Leonard Foster v. Dustin Patrick, argument not to receive $15,005.00, and the proceedings of the account at the moment are as follows. The defendant appellant in this case. At this time, I'd like to reserve three minutes for rebuttal. Your Honors, Armetta Foster escalated a routine welfare check requiring Deputy Patrick to act when she made to seize control of his patrol vehicle with a loaded shotgun inside and appeared prepared to drive it onto a highly transited public highway. The issue before the court today is the district court's error in denying qualified immunity to Deputy Patrick, despite his reasonable action taken given these circumstances. As a preliminary matter, Your Honors, I'd like to briefly address this court's jurisdiction over this appeal. In Mitchell v. Forsyth, the Supreme Court recognized that the appeal of a district court's order denying qualified immunity to an officer is immediately appealable under the collateral order doctrine to the extent it turns on an issue of law. This appeal raises the precise type of legal issue over which this court can and should exercise jurisdiction, Your Honors. The Supreme Court and this circuit have both recognized consistently that whether conduct violates clearly established law, in this case the Fourth Amendment, is a pure legal issue that this court may consider and exercise jurisdiction over. Are you prepared to concede at this time all the factual allegations of your opposing counsel? Yes, Your Honor, absolutely. Well, one of those facts would be that there's no indication that Ms. Foster was aware of the loaded weapons in the car. Your Honor, it is respectfully immaterial whether Ms. Foster was aware of the loaded shotgun in the vehicle. What's important to remember here is that the perceptions of the officer on scene are what are important. On what would he have based a perception that she knew where it was located and was about to use it or anything even approaching that? Your Honor, the officer here, Deputy Patrick, knew that there was a loaded shotgun in his patrol car. He was aware that it was located directly above her head. He was within range of that shotgun, as were her children, nearby motorists. It was reasonable for him to believe, given— She was driving away from him, wasn't she? Yes, Your Honor, but— What indicated to him she wasn't fleeing as opposed to about to shoot him or her children? Your Honor, if she was fleeing the scene, this might be a different case if she had run off down the grassy median of the interstate rather than fled toward the driver's seat of his vehicle with his loaded shotgun directly above her head. It's not material whether—and this Court has found—whether anyone was directly in front of the vehicle, whether people were in the area is important here. And it's important to remember that Deputy Patrick was in the area. This was in the middle of a busy interstate where she could have driven off, where she did succeed in driving off down the interstate. It was reasonable for him to believe under those circumstances. What do officers generally do when they see somebody speeding or driving erratically or whatever down the interstate? They probably don't shoot them eight times, do they? Your Honor, it is reasonable for an officer to shoot a fleeing vehicle that poses a serious risk to the lives of the officer or the public. And now, while this case isn't directly comparable to those types of vehicular flight cases, that's more like what this case could have been had Patrick not acted. This Court has upheld prior panels of this Court that when an officer has probable cause to believe that a suspect poses a serious risk to the officer, to members of the public, then he may act accordingly and take action to subdue that suspect. How do you distinguish the Smith v. Cup case, which to me seems to be closest to this? Yes, Your Honor. Smith v. Cup is distinguishable for a few key reasons. It's important for this Court to remember that the totality of the circumstances are key here. And in Smith v. Cup, when a suspect took control of a patrol car in that case, I believe the suspect's hands were still cuffed behind his back, so a shotgun was not as accessible to that suspect. In that case, this Court found that the suspect... But he drove it off, didn't he? He drove the car away. Yes, Your Honor, for a short distance, as Ms. Foster did. In that case, the suspect had been behaving cooperatively up until that point. In this case, Ms. Foster had been behaving erratically. Patrick didn't know what she would do next. She had been behaving strangely up until she escalated the encounter from a welfare check to one of violence. In that case, the Court also found that there was no danger to those in the immediate vicinity. This event took place in a parking lot. This case took place in the middle of an interstate on busy I-75 in Bradley County, where Ms. Foster could have and did take control of his patrol vehicle, and she actually succeeded in driving it down the interstate. What's your best case in support of your position here? Your Honor, there are multiple cases supporting our position here. There must be one really good case that you're depending upon. Sure, Your Honor. Each case does turn on the individual facts, but Williams v. Grosspoint Park can be instructive for this court. In that case, the officer was faced with a similar, very difficult decision at the time he fired his weapon. It's undoubtedly true that Officer Patrick had to make a very tough decision here, and these were difficult circumstances. In Williams, the Court noted that the officer might have either used deadly force to apprehend a suspect who had demonstrated a willingness to risk the injury of others in order to escape, or allow him to flee, give chase, and take the chance that he would further injure an officer or an innocent civilian in his efforts to avoid capture. The decision here that Deputy Patrick had to make was the same as the officer in Williams. Deputy Patrick undoubtedly had to make a very tough choice here in difficult, quickly evolving circumstances. Isn't there a factual discrepancy as to whether the officer began to fire before the suspect had entered the vehicle and was seated in the vehicle, rather than after having gotten into the vehicle? Yes, Your Honor, that was a factual dispute identified by the District Court. Deputy Patrick testified that he began to fire once Ms. Foster was already seated behind the wheel of his vehicle. One of her children testified to the same thing. But her other child, her daughter, testified that she was running toward the vehicle and only a few steps away. Either way, even if we, and we are conceding to those facts that are most favorable to the plaintiff here, even assuming that she was still running toward the vehicle, she was running toward a deadly weapon. She had been shot several times, or I don't know the shots that hit her, but several shots had been fired prior to her ever leaving the parking area, right? Yes, Your Honor, the three volleys of shots were fired here. The first shots were fired, and it is disputed, when she was either in the vehicle or running toward the vehicle, running toward a deadly weapon, running toward a loaded shotgun. The second volley of shots… Could she see the shotgun from outside the vehicle? I mean, the shotgun was up over the visor or something like that, is that right? Yes, Your Honor, it was directly above her head. If a person outside the vehicle, was the shotgun even visible to her as she moved toward the vehicle, or was that a matter of factual determination to be made? Your Honor, it's unknown whether she knew the shotgun was there, whether she even knew how to use it. But what's important here is that Deputy Patrick was concerned that she would, given her behavior up until that point. You know, if she's driving the car, and she's moving away, how's she supposed to be using the shotgun on the officer anyway? I mean, I don't know, I think that for most people, that'd be a trick of coordination that they couldn't pull off. Sure, Your Honor, it would be especially impressive to do both at once. But the sequence of events here, when Patrick began to fire, she was either running toward the vehicle or she was in the vehicle. He shot at, or did he shoot at her 13 or 14 times? 14 times, Your Honor. Almost emptied his pistol, I guess, right? Yes, and that was in three volleys of shots. The first, when she was moving toward the vehicle or inside the vehicle, assuming she was still just moving toward the vehicle. The second volley was after she was already seated in the vehicle, and that's undisputed, when he had drawn his weapon, already fired once, and told her, get out of the car, get out of the car. At that point, she put the car into drive, started to gas it. He began to fire again. At that point, she did not surrender, either voluntarily or involuntarily. She did not collapse. She, in fact, continued to drive. So at that point, he fired one final volley of shots as she began to move on to the interstate. Isn't this situation, even as you describe it, contrary to Gattawa versus Byrd? How would you distinguish that case from what occurred there? Because in that case, a person was trying to get away at the time they were shot, and the officer, I guess the court said you shouldn't just shoot somebody who's fleeing, even in a vehicle, if there's no expectation that they're going to do harm to someone. Your Honor, in this case, Armetta Foster wasn't just fleeing. She was fleeing toward his patrol car, toward the driver's seat of his patrol car, key in the ignition, engine running, loaded shotgun directly above her head. He had every indication, given her behavior up until that point, that she would continue to behave recklessly, to use the gun, to drive off with that vehicle, to make— Well, it sounds that different from Gattawa, because you had a person who had had a hostile encounter with an officer and was in a vehicle trying to get away, and the court didn't say who was to blame, but just that there was a factual dispute. Your Honor, there are no factual disputes here as to the key facts, that she was running toward the vehicle, she made it into the vehicle, there was a loaded shotgun within her arms' reach. If her primary goal had been the shotgun, isn't that the first thing she would have done? I mean, isn't—the indications are, factually, that she was driving off. I mean, as far as we know, she showed no interest whatever in the shotgun, if she even knew it was there, right? If she wanted to shoot the officer, she'd have grabbed the gun and shot him, right? Your Honor, I see that I'm out of time. May I briefly respond to your question? Yes. Your Honor, I'd like to respond in two parts. First, that she may or may not have used the shotgun is less important than what Patrick perceived. This court has awarded deference to the officer's on-the-spot judgment. That's what's important here. And this case could have become a Plumhoff, her driving off— Yeah, but the problem is there's always a range of behavior that's within the range of reasonableness, and there's a range that's not. And the problem in this case is to determine the reasonableness of the officer's perceptions. Your Honor, may I respond? I don't know that that was a question. Okay. If Judge— Whatever. If Judge Clay says it's okay, yes, briefly. Your Honor, when the officer has probable cause to believe that there's a serious threat, here there was a serious threat to him, to the public, and he had to take action. This court and the Supreme Court have upheld an officer's actions and considered them reasonable in situations like this. Thank you, Your Honors. Thank you. Your Honors, I'm Whitney Duran, and I'm representing, in essence, the children of the now-deceased woman. You don't have to take the words of the lawyers. You can look at the video of what occurred, and it was inside—the video camera was inside the police car. It was pointed directly ahead as if it were aiming for Judge Clay. You can't see much from it because it was in the median of a highway parallel to each of the two sides, but you can't see something. You can see what was directly ahead. You cannot see anywhere during the film anything until much later that occurs to the right. You can't see much, but you can hear a lot of what happens on the left side. Now, during depositions, we were told under oath by Mr. Patrick himself that audio system did not work in the video camera. There are two methods of control, one on his belt, one inside the car. He said it didn't work. He reported it didn't work. It did work. You can hear it. Starting at page 1813 in the record, there's 12 1⁄2 minutes of videotape. Now, you have to listen really carefully, and this was the problem we had. You have to turn the volume to the very highest level. You have to have fairly good hearing to start with. And to hear the screams that are on the video, you have to actually wear headphones. But you can hear screams. You can hear 14 bullets. Now, there's about 10 minutes, the first 10 minutes or 12 1⁄2 minutes of the video, there's really nothing happening that you can see or hear. It's all to the left, and the mother and her two children and an officer are in some kind of confrontation, which is in dispute, but the children were there. It was a 10-year-old girl and a 6-year-old boy, and they gave testimony within hours after their mother died, before they actually knew she died, to social workers who interviewed and put it on tape. Now, she had a knife that she pulled on the officer, or is that in dispute? It's in dispute. Her son says she had a knife. He says it was in her back pocket. The daughter says she didn't see any knife. The officer said... He said the younger child... He's the 6-year-old, right. There was a gun found in the car later, but there are no fingerprints on it. You mean a knife? That's a gun, a knife, excuse me. A knife was later found in the car after she fled. The police car or her vehicle? She didn't have her vehicle. She didn't have her vehicle. It was in the police car, and the Tennessee Bureau of Investigations was there promptly, and they made photographs, and there were no fingerprints on that knife inside the car. She jumped on the back of the officer, did she? The kids both say that, and they gave their separate statements to the social worker. That's not in dispute. Well, the officer may be disputing that. What he says is she pulled a knife on him. The kids say that didn't happen, but he says it did, and he mentioned nothing about her jumping on his back. Then comes the beginning of the videotape that you can really watch carefully. This is 12 and a half minutes into the tape. Watch or listen? You can both watch and listen. The first thing you do is you watch because the officer comes back into view. He's been beside the car, but he runs up in front of it, and four critical seconds happen. He gets in front of the vehicle. He's square in front of the camera. Two seconds pass. He draws his gun, and then he goes back up to the side, and he starts firing. Within four seconds after coming into view, he's firing, and he fires four times, and he hits her. He hit her in the left buttock, and we know that because she was outside the car by admission, and the autopsy shows a bullet hole through the left side of her buttock. A photograph of the jeans she was wearing shows a hole in the jeans on the left side. He hit her with one of those first four shots. That's outside the car? Outside the car. She couldn't have been inside the car because you can't fire the gun in such a way that it'll go through the door and hit her. Given where the bullet hit her, she must have still been outside the car. She was hit later by subsequent bullets all along the side of her body. There were eight shots all together that hit her. There were eight that went through the door. They aren't necessarily the same eight, but it did happen, and she was hit all along the side of her body. Were the children in the car when he fired? No, they were outside. They were, in essence, where you are, and they were watching. She told them to get in the car. He told them not to, and they didn't get in the car. They did not get in the car. Now, the daughter says, at a little later point, there were 16 shots fired all together, and it was really fast. I think it was a total of 26 seconds where 14 shots were fired. But the daughter says the mother was fleeing the policeman. She'd already been hit. That's why she was trying to get away the best way she knew how. She jumped in the car, and while she was in the car, and he wasn't moving. A lot of shots went in. Do you contest whether she was originally moving toward the car in order to flee in it, or do you think he just started shooting when her intent was unclear, or do we know from these facts? We don't know, but we can test the facts, and there's very little testimony by anybody about exactly what was happening. All we know is that he fired four seconds after he went in front of the video camera, and she had to have been outside, and then she did get inside. And the rest of the shots, the 13 other shots, were fired at, well, I'm sorry, there were four. No, no. Would we say there's a fact dispute on this record about whether or not her intention was to get in the car? Or was it clear, I mean, do you agree that it's clear from the record that that was her intention from the get-go when she started moving away from the officer? We don't know why she initially ran toward the car, and she may have gone sideways toward the car rather than along the side of it. But in any event, we don't know that, and we can't tell from anybody's testimony. It's just unresolved or disputed or whatever. I mean, the daughter says at some point, not the initial point, at some point, she was fleeing to get away from those bullets that were coming at her very quickly. What's your best case in support of your position? Smith v. Cup case, which coincidentally was in the next county over from the one in which we were involved, also named Hamilton County. And every officer in both those counties must have known exactly what happened in the Smith v. Cup case because it's so close to what happened here, about as close as you can get. And as a result, the legal precedent was clearly established, and almost certainly any reasonable officer would have known what you can't do, which is shoot under the circumstances he faced. Now, I want to draw your attention to two periods of time that are important, and the officer tends to get them mixed up. There's this first period of time when they're to the left of the vehicle and this confrontation is going on. He says he was in danger because of the knife. You can't accept that as true because it's disputed by the testimony of the children. In any event, if there was a danger, what he did in response was to go to the front of the car and draw his pistol. By the way, he had a taser. He had a chemical weapon. He had a baton all on his belt. He had alternatives, but he pulled that gun out and started firing within four seconds. Did you say he had a taser and he had some sort of chemical weapon? He had them both on his duty belt. So he had some alternatives if he chose to use them. He went straight for the gun and started firing. Now, there were three bursts. There were four shots, and that took place over four seconds. Just a little bit later, there were six shots, and during those six shots, there were three screams. You can hear them. Put your earphones on and you can hear them. Then there's an 18-minute gap, 18-second gap. Nothing is happening, but you can see or hear. Then the last occurrence is four more shots, the final four, 11 through 14. There's 18 seconds between the first two volleys and the last one? Yeah, there is. There's just nothing happening. Now, at that point, she starts moving the car. There were four shots. It's hard to pinpoint this exactly, but almost certainly she waited until the fourth shot. But in any event, the car starts moving about the time the four shots occur, the last four. Well, if she had started moving the car immediately, wouldn't she have been pretty far down the interstate by the time 18 seconds had gone? It's clear that she did not move it. She may have been, but as you'll see on the video, that car really moved slowly. It just crawled away. And remember, it's going. Was this after the last volley? After the last volley. And then for about 31 seconds, she's in the car and she's moving it. I mean, there are cars all up and down. Well, what is the officer's explanation for the delay and what was happening during the delay? There is no explanation that he gives. So, she gets in the car. It's hard for me to imagine how you could move it, but she moved it. For 31 seconds, she drove, and she drove remarkably carefully. She moves out. Cars are parked alongside the road. They know something's wrong, and so they get out of the way. She actually passes the car. She gets in the left lane and passes the car and then gets back in the right lane. She has remarkable control, but soon, very quickly, within 31 seconds, she loses control. She goes outside the road, hits a tree, crashes, and sometime shortly thereafter, she died. Those are the events. Now, the clearly established law is Smith. I think it speaks for itself all by itself. All these facts that we've talked about, it seems to me, are either undisputed and in our favor or they have to be conceived by the other side. To me, there's a very open question about whether you have jurisdiction based on the facts as we have recited them. In order to make a case for the appellant, they have to bring in these conversations that are disputed. Their whole case is conversations as opposed to video or autopsy reports or photographs of the Tennessee Bureau of Investigation. Our case is nothing but that. So, given that and the lack of any genuine dispute about facts, we believe the score really doesn't have jurisdiction. That's it for me. Well, a better result for you is the finding that he's just not entitled to qualified immunity, right? Yes, that's what we're asking. Your opponent says this Williams against Grosse Pointe is the best case for her. How is this case different from that? Well, if I'd read Williams versus Grosse Pointe, or I probably read it, but I just don't remember it, I could give you an answer, but I don't have an answer. I think Williams is a case that I wrote, if I'm not mistaken, and I don't think it involves anything very analogous to this situation. I think it involves somebody who'd been stopped in a moving car and was trying to then further flee the scene. I don't know, but I don't believe it's very factually analogous, if memory is serving me right, which it might not be. I don't have any further statements. All right. I don't have any further questions. Thank you. Your Honors, I'd like to clarify a few points briefly. This court does have jurisdiction. We have conceded the disputed facts to the plaintiff and argued that based on the undisputed facts in this case, they are sufficient for this court to decide that Patrick's actions were objectively reasonable given these circumstances. Is Williams the case I'm remembering? Yes, Your Honor. You wrote the Williams opinion. Williams is somewhat analogous to this case. There are other cases that we can draw from as well. How do you analogize the decedent in Williams to Ms. Foster? Williams, like the decedent Ms. Foster here, was behaving recklessly, would take action to try to escape that might injure others. He just about ran over an officer, didn't he? Yes, that's correct, Your Honor. No case is directly comparable to this case, but we can draw from other cases like Williams. Williams, in that situation, was found to be behaving reckless, would do anything to try to escape. That's comparable to Foster here. The important perspective for this court to keep in mind is the officers... I think that in Williams, the decedent actually perhaps hit one of the officers. Yes, Your Honor, I believe that's true. But there's Williams, there is Cass v. City of Dayton. Plumhoff is what this case could have become had Patrick not acted. The Constitution doesn't require Patrick to stand by, allow a person who'd been behaving erratically to take control of his patrol vehicle with a loaded weapon inside and drive it away and see what happened. And that justifies full force? Yes, Your Honor. To kill that person? Yes, Your Honor. 14 shots? Yes, Your Honor. There is an imminent threat here, both to him, both to the public, everyone in the vicinity that justified the use of deadly force. There is no doubt that this situation ended tragically, but that doesn't mean Deputy Patrick's actions were unreasonable given these circumstances. The officers' on-the-spot judgment is important here, and Graham v. Conner has cautioned courts against taking advantage of the 2020 vision of hindsight to evaluate the officers' actions from the comfort of a courtroom like this. He had to make that decision in less than a minute, a difficult, tough decision, when we are four years removed now from this incident with three years' worth of litigation and discovery all to our benefit in analyzing his actions. When he had to make that decision quickly in rapidly evolving circumstances, which this court has found Graham's prohibition on using the benefit of 2020 hindsight carries even greater weight when the situation escalated very quickly as it did here. We would ask that this court reverse the judgment of the district court. Thank you, Your Honors. Thank you.